**United States District Court**
**District of Massachusetts**

```
_____  )
                                 )
NORTHEASTERN UNIVERSITY,         )
                                 )
          Plaintiff,             )
                                 )   Civil Action No.
          v.                     )   13-12497-NMG
                                 )
BAE SYSTEMS INFORMATION AND      )
ELECTRONIC SYSTEMS INTEGRATION   )
INC.,                            )
                                 )
          Defendant.             )
_____  )
```

<u>MEMORANDUM & ORDER</u>

**GORTON, J.**

This case arises out of a contract dispute between Northeastern University ("Northeastern") and BAE Systems Information and Electronic Systems Integration Inc. ("BAE"), a research and development firm.  The contract at issue is a cost-reimbursable, sub-award agreement ("the Agreement") to develop an acoustic receiver array system ("the Array") as part of a project funded by the National Science Foundation ("NSF"). Northeastern claims that the Agreement requires BAE to deliver a "fully functioning" 192-element Array for a certain price by a certain date while BAE contends that it is only required to use its best efforts in performing as far as the project's budget permits.

Pending before the Court are BAE's motion to dismiss in part for failure to state a claim (Docket No. 25) and Northeastern's motion for a preliminary injunction that would require BAE to provide Northeastern with a "fully functioning" 192-element Array on or before January 15, 2014 (Docket No. 8). For the reasons that follow, BAE's motion will be allowed and Northeastern's motion will be denied.

I.   **Background**

  A.   **The NSF Research Award**

In September, 2010, Northeastern received a grant package ("the NSF-ONR Development Grant") from the National Science Foundation and the Office of Naval Research ("ONR") to develop, build and test a 192-element acoustic receiver array system to monitor ocean sounds and measure the underwater environment.

Northeastern's application to the NSF was titled "MRI: Development of a Lightweight Towed Array Receiver (LTAR) for Wide-Area Ocean Monitoring and Imaging." Northeastern proposed to develop and build a LTAR system equipped with novel technology that would enhance state-of-the-art research in a variety of marine science fields. It acknowledged that a significant but well understood development would be required to attain the necessary compact but sturdy design. The application also noted that subcontractors including BAE would aid in the

engineering effort.  It specified that BAE would provide surface and subsurface electronics and overall systems integration.

NSF issued the subject grant as part of its Major Research Instrumentation Program, which seeks to facilitate scientific and engineering research and training by funding acquisition or development projects. NSF Pub. 10-529, § II.A.1.  The program guidelines state that research instrumentation that is acquired or developed through an NSF award is expected to be operational for regular research use by the end of the award period. Id. § I.A.

Northeastern was also part of a consortium of universities that applied for and was awarded a grant from the ONR and the Norwegian government to conduct an experiment using the Array in February, 2014 ("the ONR-Norwegian Seas Project").  Northeastern mentioned that experiment in its application for the NSF-ONR Development Grant.

**B.   The Agreement**

Northeastern and BAE entered into the Agreement in or about April, 2011.  The exact date is in dispute and is not relevant to the issues before the Court.

As mentioned above, the parties did not initially plan to have BAE complete the entire Array.  Instead, BAE proposed in April, 2010 to perform "integration support" work under a cost-plus-fixed-fee contract.  Its proposal included a project budget

-3-

of $333,614 and BAE pledged to contribute $158,171 in accordance with NSF's cost-sharing requirements.  A later proposal dated in March, 2011 increased the project budget to $975,462 (of which BAE was to contribute $542,843) and indicated that BAE would perform the building and development work that was originally slated to be completed by other subcontractors.

The Agreement is a form contract with five attachments.  It discloses an "amount funded" for the project ($975,462) and a "budget period" of about one year.  The Statement of Work ("SOW") attached to the Agreement, which appears to be identical to the SOW attached to BAE's March, 2011 proposal, divided the project into several discrete tasks, each of which was projected to be completed within two to six months.  The same attachment included a "Summary Proposal Budget" that described the costs BAE expected to incur in providing personnel, equipment and materials for the project and noted that BAE would charge a fixed fee of $59,273 for its work.  The costs and fee total $975,462.  Finally, the Agreement included a termination clause which allowed either party to terminate upon 30 days written notice.

The parties amended the Agreement several times.  First, in August, 2011, BAE provided Northeastern with a revised SOW which increased the number of elements in the Array from 128 to 192 and explicitly stated that the Array would be towed at depths of

-4-

as much as 200 meters.  BAE's cover letter accompanying the
revised SOW explains that those revisions introduce new "cost
and performance risks" to the development project.  The
amendment, as enacted, incorporated the updated SOW and extended
the deadline for completing the project.  Northeastern's
complaint asserts, however, that the parties always understood
that the Array would have 192 elements and therefore the
amendment merely corrected a drafting error.  A later amendment
extended the deadline to September, 2013, and increased the
grand total to be paid to BAE to approximately $1,077,000.

### C.   Suspension of Work on the Array

The instant suit was filed after the parties' relationship
soured in early 2013.

One major source of the breakdown appears to have been
caused by a sea-testing excursion in April, 2013.  BAE
originally represented that it would be able to complete the
Array in time for that test but informed Northeastern just two
weeks beforehand that it would be able to deliver only a 64-
element "sub-array" rather than the full 192-element Array by
the testing date.  Northeastern claims that it committed
$420,000 to charter a ship in order to conduct the tests and it
was too late to cancel at that stage.  Moreover, Northeastern
contends that the sub-array BAE provided did not work at all
because BAE had not wired it properly.  BAE acknowledges some

wiring issues but asserts that it worked "feverishly" to correct the problems.  It also maintains that a portion of the sub-array was operational and was able to record sounds made by sperm whales.

Another dispute concerns Northeastern's payments to BAE. BAE alleges that Northeastern failed to make payments totaling $55,701 due in March, 2013, and May, 2013, respectively. According to BAE, Northeastern's principal investigator informed BAE that Northeastern would not make any further payments until BAE completed and delivered a "functioning array."

A final disagreement concerns BAE's decision to suspend all work on the Array.  In June, 2013, it informed Northeastern that it had exhausted the project budget and therefore would not continue to work on the Array.  BAE appears to have consistently adhered to the position that it would be willing to resume work if another $600,000 were added to the budget but Northeastern has been unreceptive to that proposal.  BAE sent Northeastern a formal letter of termination on October 1, 2013, the same day that Northeastern filed suit.

### D.  Procedural History

In October, 2013, Northeastern filed this action in the Massachusetts Superior Court for Suffolk County.  BAE removed the case to this Court which held a hearing on Northeastern's motion for a preliminary injunction and took the matter under

advisement.  Shortly thereafter, Northeastern amended its
complaint and BAE moved to dismiss part of Northeastern's claim.

The amended complaint includes two counts, both of which
are premised on BAE's alleged material breach of contract.
Northeastern asserts that BAE breached 1) by failing to deliver
a fully-functioning Array and 2) by demanding additional
compensation before resumption of work on the project.  Count I
claims that Northeastern is entitled to specific performance
consisting of "BAE's delivery of a fully functioning Array by
January 15, 2014."  Count II claims that the subject breach
entitles Northeastern to damages, including the money it has
paid to BAE under the Agreement, costs incurred in testing the
non-functioning sub-arrays and costs incurred in connection with
the ONR-Norwegian Seas Project.

## II.   Defendant's Motion to Dismiss in Part

BAE has moved to dismiss in part.  It seeks to dismiss
Count I of Northeastern's amended complaint on the grounds that
it fails to state a claim upon which relief can be granted and
Count II to the extent that it seeks damages based on the
premise that the parties' agreement required BAE to deliver a
"fully functioning Array."  For the reasons that follow, that
motion will be allowed.

## A.    Legal Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In considering the merits of a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).  Yet "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice to state a cause of action. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Accordingly, a complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of anything more than the mere possibility of misconduct. Id. at 679.

A court may not consider documents that are outside the complaint or "not expressly incorporated therein," unless the motion to dismiss is converted into one for summary judgment. It may, however, consider documents "integral to or explicitly relied upon in the complaint" even if they are not attached to the complaint. Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000).  It is also permitted to consider a document when the complaint's factual allegations are "expressly linked to" and "admittedly dependent upon" that

-8-

document and its authenticity is not challenged. <u>Alt. Energy, Inc.</u> v. <u>St. Paul Fire & Marine Ins. Co.</u>, 267 F.3d 30, 34 (1st Cir. 2001).  For instance, the First Circuit Court of Appeals has held that it was proper to consider a document attached to a motion to dismiss and relied on by both parties in their arguments with respect to that motion. <u>Blackstone Realty LLC</u> v. <u>FDIC</u>, 244 F.3d 193, 195 n.2 (1st Cir. 2001).

**B.  Analysis**

Northeastern's complaint alleges breach of contract.  To prevail on its claim under Massachusetts law, Northeastern must prove that 1) a valid, binding contract existed, 2) BAE breached the terms of the contract and 3) Northeastern sustained damages as a result of the breach. <u>Young</u> v. <u>Wells Fargo Bank, N.A.</u>, 717 F.3d 224, 232 (1st Cir. 2013).

The parties' dispute concerns whether, as a matter of law, BAE breached the Agreement.  The question of whether BAE breached the Agreement depends on how it is interpreted. Northeastern maintains that the Agreement requires BAE to deliver a "fully functioning" 192-element Array for a certain price by a certain date.  BAE, for its part, contends that the Agreement contemplates that work would be completed on a "cost-reimbursable" basis rather than for a fixed price.  It asserts that it was obligated only to use its best efforts to perform

the tasks outlined within the SOW and was not required to continue to perform once the budgeted amount had been expended.

Under Massachusetts law, contract interpretation poses a question of law. Bank v. Int'l Bus. Mach. Corp., 145 F.3d 420, 424 (1st Cir. 1998).  As a general proposition, a court construing a contract must give contract terms their plain and ordinary meaning "in light of the circumstances and in view of the subject matter." Samia Cos. LLC v. MRI Software LLC, 898 F. Supp. 2d 326, 336 (D. Mass. 2012) (quoting Polito v. Sch. Comm., 868 N.E.2d 624, 627 (Mass. App. Ct. 2007)).

If the contract is alleged to be ambiguous, the court must determine if an ambiguity, in fact, exists.  A contract is ambiguous only where an agreement's terms are "inconsistent on their face" or where the "phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Bank, 135 F.3d at 424 (citing COLL v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)).  If the contract is ambiguous, the court may look to extrinsic evidence of the parties' intentions at the time the contract was formed in an attempt to resolve the ambiguity. Samia Cos., 898 F. Supp. 2d at 336 (quoting President of Harvard Coll. v. PECO Energy Co., 787 N.E.2d 595, 601 (Mass. App. Ct. 2003)).

Applying those principles to the subject contract, the Court finds that the Agreement is unambiguously a cost-reimbursable contract.  The term "cost-reimbursable sub-award" appears on the face of the agreement and is given meaning by regulations incorporated into the Agreement or otherwise relied upon by the parties.[1]

For instance, the parties both cite Part 16 of the Federal Acquisition Regulations ("FAR") which distinguishes between fixed-price and cost-reimbursement contracts.  The regulations state that fixed-price contracts set a firm price for the work to be performed and thus allocate "maximum risk" to the contractor, who must perform for the stated price even if the contract turns out to be unprofitable. 48 C.F.R. Part 16, Subpart 16.202-1.  They further provide that a fixed price contract is appropriate when fair and reasonable prices can be determined at the outset. Id. 16.202-2.

In contrast, cost-reimbursement contracts

establish an estimate of total cost for the purpose of obligating funds and establishing a ceiling that the contractor may not exceed (except at its own risk) without the approval of the contracting officer.

---

[1] The subject regulations cited by both parties refer to contracts between the government and awardees and do not specifically state that the same principles apply to subcontracts between awardees and sub-awardees but the Court discerns no reason not to apply those regulations to the subject sub-award which incorporates them by reference.

Id. 16.301-1.  The regulations state that such contracts are suitable for use "when uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract." Id. 16.301-2.

Similarly, NSF's Proposal and Award Policies and Procedures Guide defines the term "Cost Reimbursable Award" as a kind of grant under which NSF

> agrees to reimburse the grantee for work performed and/or costs incurred by the grantee up to the total amount specified in the grant.... Accountability is based primarily on technical progress, financial accounting and fiscal reporting.

NSF Pub. 10-529, intro., § D(d).

Because the budget proposal included a fixed fee, FAR provisions relating to "cost-plus-fixed-fee" contracts also apply. 48 C.F.R. Part 16, Subpart 16.306(a).  The regulations suggest that such a contract is appropriate for certain development and testing projects.  They also provide that, under certain circumstances, the government may condition payment of the fixed fee on completion of a "specified end product" or the government being satisfied with the contractor's work but it may not withhold otherwise reimbursable costs. Id. 16.306(d).  If the contract contemplates a specific end product and the work cannot be completed within the estimated budget, the regulations provide that the awarding party "may require more effort"

without paying an additional fee, <u>provided that it "increases the estimated cost."</u> <u>Id.</u> 16.306(d)(1) (emphasis added).

In sum, the regulations clarify that a cost-reimbursement contract covers costs incurred up to the amount allocated to the project and does not require the contractor to perform beyond the budgeted amount without further compensation.  To the extent that the contract involves a fixed fee added to the cost-reimbursement structure, the awarding party may place conditions on when it will award the fee or require additional efforts before awarding the fee if the initial efforts prove unsatisfactory but it cannot refuse to compensate the contracting party for costs incurred beyond the project budget.

Northeastern is correct that the Agreement does not include an express "best efforts" clause.  Yet that fact alone does not require BAE to complete the Array for a fixed price even if its costs exceed that price.  Instead, the concept of "best efforts" is implicit in the nature of a cost-reimbursement contract which focuses on a contractor's input rather than its output. <u>McDonnell Douglas Corp.</u> v. <u>United States</u>, 37 Fed. Cl. 295, 299 (1997) (citing <u>Gen. Dynamics Corp.</u> v. <u>United States</u>, 671 F.2d 474, 480-81 (Ct. Cl. 1982)).

Furthermore, other provisions of the Agreement are consistent with the cost-reimbursable form.  For instance, while the SOW contains language that suggests that certain tasks would

-13-

be completed within specified phases of the project, such
language is consistent with the cost-reimbursable form.  Common
sense dictates that a cost-reimbursable contract, like a fixed-
price contract, envisions that certain tasks will be completed.
The key difference, however, lies in how the two kinds of
contracts allocate the risk of failure to complete the allocated
tasks.

     In the instant case, Northeastern chose to enter into a
cost-reimbursable contract with BAE and, therefore, assumed the
risk that the project would not be completed within budget.  The
Court will not upset the parties' arrangement and reform the
contract to require BAE to deliver a "fully functioning Array,"
particularly in light of the fact that the contract fails to
define the meaning of that term.  Thus, to the extent that
Northeastern's breach of contract claim rests on BAE's failure
to deliver a "fully functioning" Array within a certain time
period for the cost provided in the budget, its claim will be
dismissed.

     Northeastern's breach of contract claim also alleges that
BAE breached the Agreement by refusing to honor its obligations
under the Agreement.  There are sufficient allegations in the
complaint from which, if proven, a fact-finder could conclude
that BAE did not perform its contractual obligations.  For
instance, the jury could find that BAE failed to use its best

-14-

efforts in performing the contract.  BAE does not seek to dismiss the complaint in its entirety and Northeastern is free to pursue its claim in that respect.

### III. **Northeastern's Motion for a Preliminary Injunction**

For similar reasons, Northeastern's motion for a preliminary injunction that would require BAE to deliver a fully functioning Array no later than January 15, 2014 will be denied.

#### A.   Legal Standard

The party moving for a preliminary injunction must show

> that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.

Voices of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 (2008)).  Out of these factors, the likelihood of success on the merits "normally weighs heaviest on the decisional scales." Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).

The moving party has a greater burden when it seeks a "mandatory" preliminary injunction that would compel the non-moving party to perform an affirmative act rather than a "negative" injunction that would prevent the non-moving party from engaging in a certain activity for the period before trial. See Braintree Labs, Inc. v. Citigroup Global Mkts. Inc., 622

F.3d 36, 40-41 (1st Cir. 2010) ("Because a mandatory preliminary injunction alters rather than preserves the status quo, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" (quoting Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency, 649 F.2d 71, 76 n.7 (1st Cir. 1981)).  Courts are generally disinclined to issue mandatory preliminary injunctions "unless the facts and the law clearly favor the moving party." L.L. Bean, Inc. v. Bank of Am., 630 F. Supp. 2d 83, 89 (D. Me. 2009).

Similarly, the First Circuit requires a "strong" likelihood of success where, as here, a preliminary injunction would provide substantially the same relief that the moving party would obtain by prevailing at trial. Rivera-Vega v. ConAgra, Inc., 70 F.3d 153, 164 (1st Cir. 1995) (citations omitted).

**B.  Analysis**

With that heightened standard in mind, the Court finds that a mandatory preliminary injunction is unwarranted.  It has already found that, as a matter of law, Northeastern is not entitled to a "fully functioning" Array by January 15, 2014, for the amount outlined in the project budget.  Furthermore, such a mandatory injunction would give Northeastern exactly the relief it seeks while imposing a significant burden on BAE.  While Northeastern may be correct that it stands to suffer irreparable harm to its reputation and to its ability to obtain grant

funding in the future, that factor is not enough to overcome its insufficient showing of a likelihood of success or that it would suffer from an imbalance of the equities. See Ross-Simons of Warwick v. Baccarat, Inc., 102 F.3d 12, 19-20 (1st Cir. 1996) (defining irreparable harm); Braintree Labs, 622 F.3d at 42-43 (explaining the "sliding scale" under which irreparable harm is weighed against the other factors).

In sum, Northeastern has not carried its heavy burden of demonstrating that it is entitled to injunctive relief in its favor and its motion will, therefore, be denied.

## ORDER

Accordingly,

1)  Defendant's motion to dismiss, in part, (Docket No. 25) is **ALLOWED**.

2)  Plaintiff's motion for a preliminary injunction (Docket No. 8) is **DENIED**.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated November 27, 2013